[No. 27458. *En Banc.* September 14, 1939.]

THE STATE OF WASHINGTON, *Respondent,* v. K. W. BERRY et al., *Appellants.*[1]

[1]Reported in 93 P. (2d) 782.

496

*C. D. Cunningham,* for appellant Berry.

*W. H. Abel,* for appellant Smith.

*Wallace G. Mills,* for appellant Reddick.

*Ralph L. J. Armstrong,* for appellant McAloon.

*Smith Troy, J. W. Graham, Leonard E. Top,* and *John S. Lynch, Jr.,* for respondent.

MILLARD, J.—The defendants Berry and three others were charged, as follows, by two counts in an information filed in the superior court for Thurston county, with the crimes of kidnaping in the first degree and of assault in the first degree:

"They, the said K. W. Berry, William McAloon, James Reddick and Robert Smith, in the county of Thurston, State of Washington, on or about the 19th day of August A. D., 1938, did wilfully, unlawfully and feloniously, seize, confine and inveigle another, to-wit, one Irving Baker, with intent to cause the said Irving Baker without authority of law to be secretly confined and imprisoned, and that said act or acts as heretofore in this paragraph outlined was wilfully, unlawfully and feloniously committed by all of said defendants as aforesaid, jointly and by each of said defendants as aforesaid, wilfully, unlawfully and feloniously aiding, encouraging, assisting, counseling and abetting each other in the unlawful commission of said crime.

II

"They . . . did wilfully, unlawfully and feloniously, with intent to commit a felony upon the person of another, to-wit, one Irving Baker, did assault the said Irving Baker with deadly weapons, which said deadly weapons were then and there held and used by the said K. W. Berry, with such force and in a manner likely to produce the death of the said Irving Baker,

and that said act or acts as heretofore in this paragraph outlined was wilfully, unlawfully and feloniously committed by all of said defendants as aforesaid, jointly and by each of said defendants as aforesaid, wilfully, unlawfully and feloniously aiding, encouraging, assisting, counseling and abetting each other, and particularly the said K. W. Berry in the unlawful commission of said crime."

While all of the defendants pleaded not guilty, each admitted that he was a participant in the acts constituting the crimes which all were charged with committing. In justification of his role in this drama of atrocity, Berry alleged that his wife was raped by the complaining witness, and that he, Berry, was lured by the officers of the law into the commission of the crimes charged. Reddick sought to be absolved on the ground that he acted under compulsion. Alcoholism, which rendered him incapable of realizing what he was doing, was advanced by McAloon as excusatory of the part he played. Smith asked exculpation on the theory that he thought the course pursued by him and the other defendants was lawful.

Trial to a jury resulted in verdicts finding the four defendants guilty of kidnaping in the first degree, Berry, Reddick and McAloon guilty of assault in the first degree, and Smith guilty of assault in the second degree. By special verdict, the jury withheld the death penalty for the crime of kidnaping in the first degree. Judgment was entered that the four defendants shall be imprisoned for life on the kidnaping conviction, that Berry, Reddick and McAloon be imprisoned not more than twenty years on the first degree assault conviction, and that Smith be imprisoned not more than ten years on the second degree assault conviction; the sentences of each defendant to run consecutively. The defendants appealed.

The facts established by the verdict are summarized.

Appellant Berry, age fifty years, was a practicing physician and surgeon of the city of Olympia at the time he was placed under arrest for the crimes charged. He was twenty-three years older than his wife, whose fidelity to him he doubted. On July 2, 1938, a house party was held at Mud Bay, near Olympia, in a house or cabin the rental of which was paid by Berry. The idea of the house party originated with Dr. and Mrs. Berry and another married couple. The Fourth of July was on Monday, and it was the intention of those who participated in that party to spend the week-end at the camp and return to Olympia in the afternoon or evening of Monday, July 4th. In addition to appellant Berry and wife and complaining witness Baker, three other men and four other women attended the party.

A few minutes before midnight, July 3rd, appellant returned to Olympia for a twenty-four hour tour of duty at St. Peter's hospital, pursuant to a rule that required him, as one of those on the hospital staff on Sundays and holidays, to serve from midnight, July 3rd, to midnight, July 4th. He had an understanding with his wife that she would return to Olympia Monday morning, July 4th, to prepare breakfast for him, and he would then return her in his automobile to the house party at Mud Bay.

Mrs. Berry did not return to Olympia and prepare breakfast for Dr. Berry, who, about noon, July 4th, went to the camp to ascertain the reason his wife breached the breakfast agreement. No explanation satisfactory to him was forthcoming, whereupon the enraged husband departed from the camp, returned to his home in Olympia, left a note informing his wife of his intention to separate from her, and then automobiled to Tacoma, where he remained all night.

Dr. Berry returned to Olympia the morning of July 5th. He resumed his efforts, which included whipping Mrs. Berry July 7, 1938, to compel his wife to explain her disregard of her promise to return to Olympia July 4th and prepare his breakfast. Berry, who was suspicious that his wife was guilty of infidelity, persisted in his attempts to wring from her an admission of guilt and obtain the name of her paramour. She denied repeatedly until as late as July 20, 1938, any sexual relations by force or consent. On July 25, 1938, Berry again brutally whipped his wife and terrorized her into fabrication of the story that she was raped by Baker about six a. m., July 4, 1938, in the front seat of Baker's automobile.

Early in August, 1938, some discussion was had by Dr. Berry, Mrs. Berry, and her parents, with the prosecuting attorney for Thurston county respecting the filing of an information charging Irving Baker with the crime of rape. The prosecuting attorney informed those present that, while he advised against the subjection of Mrs. Berry and her family to such an ordeal. if Mrs. Berry would sign a complaint charging Mr. Baker with the crime of rape, a warrant for the arrest of Mr. Baker would issue and he would be placed on trial. Appellant Berry then agreed, on suggestion of his wife, to a substitute plan, which contemplated a meeting at which the prosecuting attorney, other officers, appellant Berry, Mrs. Berry, and Mr. Baker would be present. Mr. Baker would be confronted by Mrs. Berry, who would accuse him of having raped her, and Baker would be required to depart from Olympia.

On or about this time, Dr. Berry solicited the assistance of William McAloon, age fifty-five years, a former law enforcement officer of Grays Harbor county, Robert Smith, age thirty-three years, a farm hand of Grays

Harbor county, and James Reddick, age twenty-eight years, a taxicab operator in Olympia, in punishing Baker. On August 19, 1938, Berry again interviewed the three men just named and induced them to assist him in committing the proposed acts, as to the nature of which he informed each of them.

Prior to August 19th, Berry obtained from the office of a justice of the peace in Grays Harbor county a blank warrant for arrest, on the representation that he intended to play a joke on a recently wedded couple. On August 19th, he assisted McAloon to redeem a revolver from a party who held same as security for payment of an indebtedness. This revolver was used in commission of the crimes of which appellants were convicted. By misrepresentation, Berry obtained a set of license plates which were placed on his automobile August 19th just prior to the kidnaping and were used to prevent identification of Berry's automobile.

Berry brought Smith and McAloon from Grays Harbor county the evening of August 19th to Olympia, where Smith was stationed in a position enabling him to watch the business place of Baker, a retired Coast Guard officer thirty-seven years old, who was engaged in the automobile business. Smith was supplied with an officer's star, and McAloon was in possession of the revolver redeemed by Berry. After Berry learned that Baker had departed from his place of business for his home, the four appellants drove in Berry's Buick sedan to the corner of Seventeenth and Columbia streets, in Olympia, where Berry got out of his automobile. About one block distant, on east Eighteenth street, Baker resided with his family (his wife, a son twelve years old, and a daughter six years old), who had moved from Seattle to Olympia about one month prior to this date. The post of Berry was where he could not be observed, but at that point he had a full view

of what his co-conspirators were accomplishing at and in the Baker home, and was at a place from which he could escape if his accomplices failed in their purpose and were apprehended..

About ten minutes past ten p. m., either McAloon or Smith knocked at the door of the Baker home. Mrs. Baker opened the door, turned on the porch light and called her husband to the door. Smith handed to Mr. Baker the fictitious "warrant for arrest" prepared by Berry, charging Baker with raping "Elizabeth Berry," and said "I have a warrant for your arrest." Smith then grasped Baker by the shoulders and stated "We are going to take you with us." McAloon placed the muzzle of the revolver mentioned above against Baker's back and said "I am an officer of the law, you come with me."

By aid of the counterfeit warrant and the menacing revolver, Baker was, against his will, forced from his home and out of the presence of his wife and two small children into the night, where in front of his home he was roughly pushed into the back seat of Berry's Buick sedan, which, with motor running and Reddick at the wheel, was there waiting in readiness for the conspirators to make a quick escape. The automobile was rapidly driven to the appointed place of meeting with Berry, who got into the front seat of the automobile alongside operator Reddick. Immediately, Berry turned around, leaned over the seat, and struck Baker, who was held in the back seat by Smith and McAloon, in the face with his fists.

The automobile proceeded north to the corner of Legion way and Capitol way, thence turned to the right and proceeded east on the new Pacific highway to a point five miles east of Olympia; thence to the left off the main highway north about one-fourth of a mile on an old county road, through a thickly wooded and

uninhabited area; thence to the right a short distance, up a small incline east on an old abandoned lane thickly overgrown with brush and thickly wooded on both sides, to a point where a passerby could not have seen the conduct of appellants, who bound Baker's hands and feet and dragged their victim to a place a few feet distant from the automobile. From time to time while on the way to this destination, Berry, Smith, and McAloon struck the defenseless Baker about the head and face with a heavy flash light, with the revolver, and with their fists, causing their victim to lose consciousness during a part of the trip.

After Baker was dragged from the automobile, Berry, by assistance of the rays of a flash light held by Reddick upon the securely bound and helpless victim, subjected Baker for more than one hour to brutal treatment. Not content with repeatedly striking Baker in the face with his fists, Berry kicked his victim in the groin and other parts of the body, and mercilessly whipped Baker on the bare back, using the buckle end of a belt in accomplishing this particular part of his program of brutality. Then Berry went to his automobile and obtained a surgeon's knife and rubber gloves used by surgeons when performing operations. He returned to his victim and announced to his accomplices his purpose to mutilate and emasculate Baker. Through forcible intervention of appellant Smith—doubtless, this act influenced the jury in finding Smith guilty of a lower degree of assault than the others—Berry was prevented, in part, from achieving his avowed purpose.

Berry cut away the front portion of Baker's trousers, exposing the latter's private parts. Using a pair of pliers held in one hand, Berry, holding Baker's testicles in the other hand, struck them forcibly several times with the pliers. Berry then employing the same pliers,

tore off Baker's foreskin. Baker was bound, defenseless, helpless; yet Smith, desiring to continue in his role of accomplice to the conclusion of the program, held Baker upon the ground. McAloon with his pistol stood guard, acting as a lookout so that none might prevent the appellants from torturing Baker.

Appellants abruptly discontinued their activity and burned the fictitious warrant of arrest. Whether they ceased because they were tired or alarmed, is not disclosed. Berry used adhesive tape from his kit to tape Baker's eyes and mouth closed. The knots by which Baker was already bound were strengthened. The appellants left Baker beaten, bleeding, and semiconscious, feet and hands bound, in this out-of-the-way place to suffer from exposure and lack of medical attention. Baker finally removed his bonds, obtained aid, and was returned to his family, who immediately had him removed to a hospital.

During all of the time that he was torturing Baker, Berry endeavored to force Baker to admit that the latter raped Berry's wife; but each time he was asked to make such an admission, Baker positively denied that he ever had sexual relations with Mrs. Berry.

About midnight, Berry was arrested in a restaurant in Olympia. He first denied any knowledge of the whereabouts of Baker, but later admitted the facts. About twelve-thirty a. m., Berry was taken by the officers to locate the scene of the assault, in an effort to render assistance to the injured man, but Berry misdirected the officers and laughingly expressed his glee at the inability of the officers to find Baker. All of the appellants were quickly apprehended, and each confessed his part in the crimes of which they were convicted, as recited above.

Each appellant challenges the sufficiency of the first count of the information charging the crime of

kidnaping in the first degree. It is argued that the words "with intent to extort or obtain money or reward for his release or disposition," are applicable to the first as well as to the second method of kidnaping set out in the statute; therefore, the absence from count one of any allegation as to the purpose for which the complaining witness was confined or imprisoned is fatal.

The information charges that the appellants "did . . . seize, confine and inveigle . . . Irving Baker, without authority of law, to be secretly confined and imprisoned."

At the common law, kidnaping, which was classified as a misdemeanor, was defined as

". . . the forcible abduction or stealing away of a man, woman, or child from their own country and sending them into another." 4 Blackstone's Com., 219.

The essence of the crime at the common law was unlawful detention or imprisonment,—an "aggravated species of false imprisonment." 35 C. J. 903, § 1; 8 R. C. L. 296, § 319. It is probable that the elements of ransom or reward were not considered, for the reason that kidnaping was not perpetrated for financial gain, but primarily as a matter of expediency.

Most of the states of the United States have, in recent years, enacted statutes defining kidnaping. Generally, the common law feature of unlawful imprisonment has been retained, and there has been added a new provision relating to ransom or reward, usually stated— as in our statute—in an alternative form. Both under the common law and the statutes, the unlawful restraint and secret confining appear to be the essence of the crime, regardless of the purposes of such restraint.

"The dominating element of the offense of kidnaping, like the statutory felony of assault with intent to

murder, is the intent with which the acts enumerated in the statute are done, to wit: 'With the intent to cause him to be *secretly* confined or imprisoned against his will, or to be sent out of the state against his will,' and the adverb 'secretly' qualifies each of the verbs 'confined' and 'imprisoned,' clearly indicating a legislative purpose to denounce as a felony any surreptitious restraint of one person by another in such sort as to deprive the subject of the crime 'of the friendly assistance of the law to relieve himself from captivity.' 1 Russ. Cr. 961; *Smith v. State,* 63 Wis. 453, 23 N. W. 879." *Doss v. State,* 220 Ala. 30, 32, 123 So. 231, 68 A. L. R. 712.

The foregoing view is in harmony with the common law, though based upon a statute similar in form to the first provision of our kidnaping statute. (Laws of 1933, Ex. Ses., chapter 6, p. 8, § 1; Rem. Rev. Stat. (Sup.), § 2410-1 [P. C. § 8941-1].)

In *People v. Hope,* 257 N. Y. 147, 177 N. E. 402, the defendants entered the car of another person and, at the point of a gun, ordered the owner of the car to drive from New York to Long Island. The defendants were captured en route. Section 1250 of the Penal Law of New York reads as follows:

" 'Kidnaping defined. A person who wilfully: 1. Seizes, confines, inveigles, or kidnaps another, with intent to cause him, without authority of law, to be secretly confined or imprisoned within this state, or to be sent out of the state, or to be sold as a slave, or in any way held to service or kept or detained, against his will; . . . Is guilty of kidnaping.' "

That statute, like our statute, indicates alternative methods of kidnaping, any one of which constitutes kidnaping. In the course of its opinion, the court of appeals of New York said:

"In the case at bar the willful and unlawful seizure and confinement was established by direct evidence. The jury has found upon sufficient evidence that such

seizure and confinement was unlawful, willful and with the intent to secretly confine, imprison and detain McCarthy against his will, within the State. It has not found, nor would it have been justified in finding, that the seizure and detention was with the intent to hold to serve. Such a finding was not necessary to sustain a conviction.

"The statute must be given a reasonable construction in order to promote the efficient enforcement of the criminal law, to prevent crime and to promote the ends of justice. The object of the statute and of the common law on the subject was the same, to secure the personal liberty of citizens and to secure to them the assistance of the law necessary to release them from unlawful restraint. (*Smith v. State* [63 Wis. 453], *supra; People v. Camp* [139 N. Y. 87], *supra*.)

"The statute defining kidnapping in Minnesota is almost identical with section 1250 of the Penal Law. In the case of *State v. Newman* (127 Minn. 445) the court held that the willful and unlawful seizing of a person with the intent to cause him to be secretly confined or imprisoned within the State constituted the crime of kidnapping. We are satisfied that such is the proper construction of the statute, and that it is unnecessary to prove an intent 'to hold to serve' as contended by the appellant. It was sufficient to charge and prove that the defendant willfully and unlawfully seized McCarthy, against his will, and confined and kidnapped him with intent to cause him to be secretly confined, detained or imprisoned within this State. All of those elements were established to the satisfaction of the jury. The intent was evidenced by the fact that he was secretly seized in the night time by the use of a gun and actually imprisoned, confined and restrained in the automobile. . . .

"McCarthy was secretly seized in the night under circumstances calculated to terrify him. His captors had guns which they threatened to use to kill him with if he moved. They forced him to take the rear seat in the car. They apparently intended to take him in the car to Long Island as Klemmer was told to drive there. They had complete control of his person; he was con-

fined and imprisoned in the car. That was not a mere assault or imprisonment. He was secretly confined and imprisoned because his captors were concealing their purpose from the public by compelling Klemmer and McCarthy to appear to be willing participants in the automobile ride, when in fact they were compelled upon the threat of death to act as they did.

"The confinement and detention in the automobile for a short time, coupled with the intent, brings the case within the purview of the statute. (*State v. Leuth* [128 Iowa 189], *supra.*)

"It seems clear that under the common understanding of the term 'kidnapping' the defendant is guilty of the crime charged and the facts bring the case within the spirit and intent of the statute."

In *State v. Autheman,* 47 Idaho 328, 274 Pac. 805, 62 A. L. R. 195, it was held that one who boards another's automobile and forces such other to drive him to such places as he desires, kidnaps such other within a statute defining kidnaping as the seizure of another with intent to cause him, without authority of law, to be held in service, or kept or detained against his will.

In *State v. Harmon,* 175 Wash. 94, 26 P. (2d) 614, three masked men forced their way into the home of a banker and, menacing the banker, his wife, and two children, with revolvers, compelled that family to accompany the kidnapers to a house eight miles from the banker's home. The wife and children were kept under guard, while the banker was compelled to return with his captors to town, where the kidnapers contemplated robbing a bank. The plan to rob the bank was abandoned, and the banker and his family were left at the house eight miles from their home. One of the miscreants was apprehended three days later and convicted, under the statute of 1909 (Laws of 1909, chapter 249, p. 935, § 158; Rem. Rev. Stat., § 2410), of the crime of kidnaping, in that the defendant wilfully seized, confined or inveigled another with intent to

cause him without authority of law to be secretly confined or imprisoned. We affirmed the judgment.

See, also, *Epperson v. State,* 211 Ind. 237, 6 N. E. (2d) 538, in which defendants' conviction of the crime of kidnaping was sustained. In that case, the accused, under pretense of being good faith passengers, decoyed taxicab driver to place where he was forced to drive on at point of gun, and one of those passengers took over the wheel and drove taxicab driver to a cornfield, where he was robbed, bound, and left.

True, the common law may be of assistance in the construction or interpretation of a statute, if such statute needs to be construed or interpreted. However, where the offense as defined by the statute is plainly stated and there is no ambiguity, the court will not resort to the history of the law or the common law definitions to determine the intent of the legislature. 35 C. J. 903.

Our statutes relating to the crime of kidnaping have never been ambiguous. The old law (Laws of 1909, chapter 249, p. 935, § 158; Rem. Rev. Stat., § 2410) reads as follows:

"Every person who shall willfully—

"(1) Seize, confine or inveigle another with intent to cause him without authority of law to be secretly confined or imprisoned, or in any way held to service, or with intent to extort or obtain money or reward for his return, release, or disposition, or to lead; take, entice away, or detain, a child under the age of sixteen years with intent to conceal him from his parent, guardian or other person having lawful care or control of him, or to steal any article upon his person; or

"(2) Abduct, entice, or by force or fraud unlawfully take or carry away another to or from a place without the state, and shall afterwards send, bring or keep such person, or cause him to be kept or secreted within this state;

"Shall be guilty of kidnaping, and punished by im-

prisonment in the state penitentiary for not less than ten years."

Throughout the act, the conjunction "or," the correlative of "either," is used, which clearly expresses the legislative intent that, if any person shall *either* do the first act specified *or* the second *or* the third, etc., he shall be guilty of kidnaping. Plainly, it is not essential that all of the elements enumerated must be present in any given case to constitute the crime of kidnaping under this statute. We agree with counsel for the state that there are five separate elements, any one of which constitutes the crime:

First degree kidnaping — (1) Unlawful imprisonment, (2) holding to service, and (3) holding for money or reward. Second degree kidnaping—(4) Enticing and concealing a child, and (5) removing from the state and thereafter secreting him within the state. That is, under the 1909 statute, doing *either* one *or* another of three acts (in addition to kidnaping a child) brought the author within the kidnaping statute.

Laws of 1909, chapter 249, p. 935, § 158; Rem. Rev. Stat., § 2410:

(1) Every person who shall wilfully seize, confine or inveigle another with intent to cause him without authority of law to be secretly confined or imprisoned,

(2) *Or* in any way held to service,

(3) *Or* with intent to extort money or reward for his return, etc.

Surely, under that statute, the acts of appellants constituted kidnaping. The change in the amendatory statute is slight, in wording, the effect being to create two ways in place of three by which kidnaping can be accomplished, and to increase the penalty. It would not be a reasonable deduction that the legislature intended to weaken the kidnaping statute. It would hardly be contended that, under the 1909 statute, reward or ran-

som was a necessary element of the crime. *State v. Harmon*, 175 Wash. 94, 26 P. (2d) 614.

That the methods are alternative, is clear. The last provision does not qualify the other two preceding provisions. The 1933 statute is identical down to and including the word "imprisoned," following which are the words, "or in any way held to service with the intent to extort or obtain money or reward for his release or disposition."

That portion of the amendatory statute pertinent to the question before us reads as follows:

"Every person who shall wilfully,

"(1) Seize, confine or inveigle another with intent to cause him without authority of law to be secretly confined or imprisoned, *or* in any way held to service with the intent to extort or obtain money or reward for his release or disposition, shall be guilty of kidnaping in the first degree, . . . " Laws of 1933, Ex. Ses., chapter 6, p. 8, § 1; Rem. Rev. Stat. (Sup.), § 2410-1. (Italics ours.)

To interpret the statute in harmony with the contention of the appellants, would require a change in the grammatical construction of the two provisions of the statute. As the statute is written, there is nothing to indicate that the ransom or reward portion is referable to the first provision (unlawful confinement or imprisonment) of the statute. No comma appears after the word "service." If a comma were at that point, the position of appellants would be more tenable than the words "with intent to extort or obtain money or reward" were referable to both of the preceding provisions. It will be observed that there is no break in the continuity of the second provision, which is complete in itself, as is the first provision. See *State v. Wall*, 189 La. 653, 180 So. 476; *State v. Tiffany*, 44 Wash. 602, 87 Pac. 932.

According to the argument of appellants, to "seize,

confine or inveigle another with intent to cause him without authority of law to be secretly confined or imprisoned," within this state *without* "intent to extort or obtain money or reward for his release or disposition," would not constitute the offense of kidnaping; while it is second degree kidnaping to unlawfully take another "to or from a place without the state," and afterward "keep such person, or cause him to be kept or secreted within the state without the intent to extort or obtain money or reward for his release or disposition, . . ." Laws of 1933, Ex. Ses., chapter 6, § 1, subd. (2). Such construction of the statute would be contrary to the clearly expressed intent of the legislature to strengthen, not weaken, the kidnaping statute.

In *State v. Andre*, 195 Wash. 221, 80 P. (2d) 553, appellant contended that the language "to extort or obtain money or reward" related to both methods in which the crime of first degree kidnaping may be committed. The state's position in that case was the same as the position of the state in the case at bar. We refused to determine which was the correct view of the statute (Laws of 1933, Ex. Ses., chapter 6; Rem. Rev. Stat. (Sup.), § 2410-1). We held, however, that a "reward" need not be a thing of pecuniary value. In affirming the conviction of the defendant, a fugitive from justice who forced a cab driver to drive an automobile in an attempted escape, of the crime of kidnaping in the first degree, we stressed the necessity of giving the statute a reasonable construction in order to promote the efficient enforcement of the law and, in the course of our opinion in that case, said:

"From this statute, it will be noticed that the crime of kidnaping in the first degree may be committed either by seizing, confining, or inveigling another with intent to cause him without authority of law to be 'secretly confined or imprisoned,' or with seizing, con-

fining, or inveigling another to be 'held to service.' Following this is the statement, with intent to extort or obtain 'money or reward' for the release or disposition of the subject of the kidnaping. The appellant construes the statute as meaning that the language, to extort or obtain 'money or reward,' relates to both methods in which the crime may be committed. The state says that the correct construction is that the words 'money or reward' do not relate to the first method of committing the crime, that of secretly confining or imprisoning the victim, but only refer to the second method, or that of being 'held to service.'

"It will not be necessary here to determine whether the appellant or the state has the correct view of the statute. Without so deciding, it will be assumed that the construction contended for by the appellant is the correct one. The question, then, is reduced to whether Jones' forced driving of the appellant was such a benefit to the latter as comes within the meaning of the word 'reward.' Jones was confined in the automobile by the acts of the appellant, within the meaning of the statute. *People v. Hope,* 257 N. Y. 147, 177 N. E. 402; *Doss v. State,* 220 Ala. 30, 123 So. 231, 68 A. L. R. 712.

"The legislature, by using after the word 'money' the words 'or reward,' undoubtedly intended that the word 'reward' was not used to mean the same thing as money or a thing in itself of pecuniary value. The statute should be given a reasonable construction in order to aid in the efficient enforcement of the law and promote the ends of justice. . . .

"In *Gooch v. United States,* 297 U. S. 124, 80 L. Ed. 522, 56 S. Ct. 395, an officer was unlawfully seized and carried out of the state to prevent his making an arrest. The Federal kidnaping act, as amended, used the words 'ransom or reward or otherwise.' The word 'otherwise' had not been in the act amended. Speaking with reference to the words 'for ransom or reward,' it was said:

" 'The original Act (1932) required that the transported person should be held "for ransom or reward." It did not undertake to define the words and nothing indicates an intent to limit their meaning to benefits

of pecuniary value. Generally, reward implies something given in return for good or evil done or received.'

"Later in the opinion, it was said:

" 'Holding an officer to prevent the captor's arrest is something done with the expectation of benefit to the transgressor. So also is kidnaping with purpose to secure money. These benefits, while not the same, are similar in their general nature and the desire to secure either of them may lead to kidnaping. If the word reward, as commonly understood, is not itself broad enough to include benefits expected to follow the prevention of an arrest, they fall within the broad term, "otherwise." '

"It is true that, in the concluding sentence, the court says that, if the word 'reward,' as correctly understood, is not broad enough to include benefits expected to follow the prevention of an arrest, they fall within the broad term 'otherwise.' Notwithstanding this last statement, the argument in the opinion is to the effect that the word 'reward' is broad enough to include within its meaning a benefit that will accrue to the transgressor by kidnaping an officer of the law to prevent him from making an arrest. If a benefit of that kind is included within the word 'reward,' it necessarily follows that the benefit which the appellant in this case would receive by forcing Jones to assist him in his flight as a fugitive from justice would likewise be within the meaning of that term."

When the state showed that the victim was forcibly and without authority of law removed from his home and transported to another place, wilfully and secretly confined and imprisoned, the crime of first degree kidnaping under our statute was established.

If we assume, as appellants insist, that the "reward" portion is referable to the first provision of the statute—that is, that a "reward" must be involved to constitute kidnaping—evidence concerning mutilation was received without objection and exhibited the reason for the kidnaping; which in a legal sense, under our holding in *State v. Andre, supra,* involved a re-

ward incidentally thereto. In the case cited, we said that the word "reward" *was not used to mean the same thing as money or a thing in itself of pecuniary value.*

While appellants were not charged with holding the victim to service for "reward," if, as appellants insist, the "reward" clause applies to the first provision of the kidnaping statute, and a reward was in fact shown without objection on the part of appellants, the judgment may not be reversed—the rights of the appellants were not prejudiced—upon the theory that a reward was not alleged.

A criminal kidnaps an officer—or a taxicab operator, as in the case of *State v. Andre, supra,*—to avoid arrest. The reason for avoiding arrest is to escape the mental and physical punishment of confinement in a prison. The reward is escape from the mental agony and physical restrictions of the prison, an emotional as well as a physical satisfaction. The processes of the body are not more real than the processes of the mind. The satisfaction of a mental or emotional condition may be as great—probably greater under some conditions—as a financial or physical satisfaction. It would probably be embraced within the meaning of the word "reward."

Assuming that Dr. Berry believed that his wife had been raped—such belief would be, of course, immaterial and would not be a defense of the crimes he committed—his reaction would be a desire for revenge. To satisfy that alleged emotional upheaval, Berry tortured the man presumed to have violated Berry's wife. His reward was the satisfaction of his desire for revenge. No logical distinction can be made between the satisfaction of a desire to execute vengeance, and the mental satisfaction of escape from fear of arrest.

To some extent, the same thing is true of McAloon, Reddick and Smith. Those three members of the tor-

ture group did not possess personal knowledge as to the guilt or innocence of the prosecuting witness, but they believed Berry's story. By reason of their friendship for Berry, they accepted the vicarious duty of assisting Berry in satisfying his desire for revenge, as if each of the three had himself suffered the injury. Their reward lay in the fact of an accomplished vengeance on behalf of a friend and the presumably strengthened bonds of friendship. "Rewards" of this character are in principle no different than the reward of escape from the fear of prison or the reward of the physical satisfaction of sadistic desires.

We cannot agree with the argument on behalf of appellants to the effect that, no matter what felonious purpose the criminal may have in mind, the crime of kidnaping is absent unless he is seeking a ransom. The *essence of the crime of kidnaping is the unlawful secret imprisonment;* and what was the motive of Berry and his three friends in commission of the crime, is comparatively unimportant.

An excellent discussion, by a member of the editorial board of the University of Washington Law School, of our kidnaping statute is published in Vol. XIV, No. 1, pp. 56-57, of the Washington Law Review and State Bar Journal. A particularly pertinent paragraph of that article reads as follows:

"In construing the statute it must be kept in mind that, before its enactment, confinement within the state was sufficient to constitute the offense; that the statute was designed to broaden the application of the existing laws, and that, if the ransom clause were appended to both methods of committing the crime, the confinement within the state would not constitute kidnaping unless the intent to obtain money or reward were present. It is difficult to believe that such an interpretation would be reasonable under the circumstances, for the operation of the law would be restricted to those cases in which the transgressor had the intent to obtain money

or reward. It is submitted, therefore, that the reward clause applies to the second method of committing the offense, *viz.*, holding to service, and that secret confinement within the state is sufficient to constitute the first method of committing the offense."

To sustain his claimed defense of entrapment, Berry offered to prove that he tried, without success, to persuade the prosecuting attorney to issue a warrant for the arrest of the complaining witness; that the prosecuting attorney and other officers advised him to obtain assistance and to take the "complaining witness out and beat him up;" that the chief of the highway patrol, to whom Berry exhibited the fictitious warrant, later used by appellants, advised that, "when he took the complaining witness out, he should burn the warrant and emasculate him;" that, on the assurance that, if prosecuted at all, he would be prosecuted only for the crime of assault in the third degree, he, with the assistance of his three friends, committed the offenses of which he was convicted. The rejection of that offer is assigned as error.

Even if Berry had testified in harmony with his offer of proof, and if we concede the truth of the statements, the alleged facts do not bring Berry within the entrapment rule for two reasons. First, no offer was made indicating that any officer of the law originated the idea of kidnaping or the idea of first degree assault, the crimes which appellant was charged with committing. While not pertinent to this inquiry, the testimony of Berry that, as early as July 7th, he started out with a gun to kill Baker, is interesting, as it tends to prove that the idea of violence in some form had its origin in the mind of Berry. Another reason why the facts alleged do not bring appellant within the entrapment rule is that the basic idea of the doctrine is that the acts done by officers of the law to induce its

violation must be done for the purpose of arrest and the prosecution of the violator. As stated in *Sorrells v. United States*, 287 U. S. 435, 77 L. Ed. 413, 53 S. Ct. 210, 86 A. L. R. 249,

"A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute."

There is no offer to prove that the officers made the suggestions credited to them for the purpose of prosecuting Berry. If they were made at all but were not made for that purpose, such officials would merely be accessories before the fact, and, so far as appellant is concerned, the participation of those officials as accessories would not be a defense. The rule on entrapment is stated as follows in 15 Am. Jur., 25, § 336:

"As a general rule, if the criminal intent originates in the mind of the entrapping person and the accused is lured into the commission of the offense charged in order to prosecute him therefor, no conviction may be had, though the criminality of the act is not affected by any question of consent. In some jurisdictions, however, initiative on the part of the perpetrator of an act is not essential to charge him with criminal responsibility. A person who commits a crime at the suggestion or instigation of another is just as guilty as if the design had originated with him, and it is not material in this respect that the suggestion was made by a police officer."

See, also, 1 Wharton's Crim. Law (12th ed.), 599, § 406; 18 A. L. R. 146; 66 A. L. R. 478; 86 A. L. R. 263.

The proof offered by Dr. Berry would not constitute a defense to him either as entrapment or as instigation, inducement, or solicitation; and the officers in question, if we concede the truth of the allegations that the officers made the statements ascribed to them, would

merely have been, under the statute (Rem. Rev. Stat., § 2260 [P. C. § 8695]; Laws of 1909, chapter 249, p. 892, § 8) reading as follows, principals along with Berry:

"Every person concerned in the commission of a felony, gross misdemeanor or misdemeanor, whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who directly or indirectly counsels, encourages, hires, commands, induces or otherwise procures another to commit a felony, gross misdemeanor or misdemeanor, is a principal, and shall be proceeded against and punished as such. The fact that the person aided, abetted, counseled, encouraged, hired, commanded, induced or procured, could not or did not entertain a criminal intent, shall not be a defense to any person aiding, abetting, counseling, encouraging, hiring, commanding, inducing or procuring him."

The court charged the jury that the essential elements of the crime of kidnaping, all of which the state was required to prove to the satisfaction of the jury beyond a reasonable doubt, were that, on August 19, 1938,

". . . the defendants did wilfully, unlawfully and feloniously seize, confine and/or inveigle Irving Baker, by force and threats with intent to cause the said Irving Baker without authority of law to be secretly confined or imprisoned, or to be held to service with intent to extort a reward for the release or disposition of the said Irving Baker."

The court further instructed the jury that kidnaping may be committed in either of two ways: First, by causing a person to be seized and confined or imprisoned, without authority of law; second, by causing him to be seized without authority of law to be held to service with intent to extort money or reward for his release.

In view of what we said above respecting the crea-

tion, by 1933 amendment of the 1909 statute, of two methods, in lieu of three, by which kidnaping may be accomplished, and our discussion of *State v. Andre,* 195 Wash. 221, 80 P. (2d) 553, which sustains our holding that "reward" need not be a thing of pecuniary value but may include the satisfaction of a mental or emotional condition, we see no substantial merit in the argument of the appellants that the instructions are prejudicially erroneous, as there is not present in the information any mention of reward or money, nor does the information charge that appellants held Baker to service with intent to extort a reward for his release.

The instructions of which appellants complain may not be made a basis for reversal of the judgment. The instructions are in no sense prejudicial to appellants. They are favorable to appellants and unfavorable to the state, in that the jury could easily have gained the idea that the state must prove the act to have been committed for ransom or reward, in order to hold appellants liable for the crime of kidnaping.

"A defendant can not complain of errors which are favorable to himself . . .

"Applying the rule heretofore stated, defendant cannot complain of error in instructions if the error operates in his favor. A familiar application of this principle occurs when the instructions given impose on the state a greater burden than the law requires for the purpose of sustaining a conviction, as where the instructions impose on the state a too high degree of proof, or require the jury to find the existence of elements which are not essential ingredients of the offense." 17 C. J. 358, § 3723, 17 C. J. 359-360, § 3729.

The same reasoning is applicable to the four instructions (7, 9, 12 and 24) of which appellants complain.

Counsel for appellants challenge the sufficiency of the evidence to sustain the charge of assault in the first degree, insisting that the only felony that appel-

lants could have intended to commit upon the person of the complaining witness, under the facts and circumstances of the case, was that of maiming him; and that there is no proof that the complaining witness was maimed, no evidence being presented even tending to show that the physical vigor of the complaining witness was seriously diminished or that his person was seriously disfigured by appellants' assault upon him.

"Every person who, with intent to kill a human being, or to commit a felony upon the person or property of the one assaulted, or . . .

"(1) Shall assault another with a firearm or any deadly weapon or by any force or means likely to produce death . . .

". . . shall be guilty of assault in the first degree. . . ." Rem. Rev. Stat., § 2413 [P. C. § 8758].

The appellants entered into a conspiracy to commit two felonies, in the commission of which each conspirator is chargeable with the act of each member of the conspiracy. The stated purpose of Berry was to emasculate, as well as to otherwise maltreat, the prosecuting witness. His intention, it is clear, was to kill Baker following that operation. We may disregard all intentions of Berry other than his intention to maim Baker, which offense is a felony and was committed by Berry with the pliers as recited above. So far as the law is concerned, each of the appellant coconspirators inflicted the wounds on Baker and entertained the same intent as Dr. Berry, who committed, as he announced he intended to commit, a felony (mayhem) on the person of Baker. Mayhem is defined as follows:

"Every person who, with intent to commit a felony, or to injure, disfigure or disable another, shall willfully inflict upon him an injury which—

"(1) Seriously disfigures his person by any mutilation thereof; or

"(2) Destroys or displaces any member or organ of his body; or

"(3) Seriously diminishes his physical vigor by the injury of any member or organ;

"Shall be guilty of maiming and be punished by imprisonment in the state penitentiary for not more than ten years, and the willful infliction of the injury shall be *prima facie* evidence of the *intent*." Rem. Rev. Stat., § 2407 [P. C. § 8992]. (Italics ours.)

"To constitute maiming it is immaterial by what means or instrument or in what manner the injury was inflicted." Rem. Rev. Stat., § 2408 [P. C. § 8993].

The argument for reversal on the first-degree assault conviction is not sound. The complaining witness was permanently injured; however, his recovery from the injuries inflicted by appellants does not operate to save the offenders from conviction of assault in the first degree in view of § 157 of the 1909 "Maiming" statute, p. 934, which reads as follows:

"Whenever upon a trial for maiming another person it shall appear that the injury inflicted will not result in any permanent disfiguration of appearance, diminution of vigor, or other permanent injury, no conviction for maiming shall be had, but the defendant may be convicted of assault in any degree." Rem. Rev. Stat., § 2409 [P. C. § 8994].

Our investigation does not disclose that the other questions raised by appellants are of substantial merit.

The judgment is affirmed as to each appellant.

BLAKE, C. J., SIMPSON, and JEFFERS, JJ., concur.

BEALS, J. (concurring)—That portion of § 1, chapter 6, Laws of 1933, Ex. Ses., p. 8 (Rem. Rev. Stat. (Sup.), § 2410-1), defining the crime of kidnaping in the first degree, is grammatically correct, and is not ambiguous. It does not require the addition of a comma after the

words "or in any way held to service," in order to make the language conform to the rules of grammar, or to remove any ambiguity in the language used. The addition of a comma at the place indicated would change the meaning of the statute, and, in view of the severity of the sentence which the law provides shall follow a conviction of the crime of kidnaping in the first degree, establish what it is argued would be a more reasonable statute.

The historic crime of kidnaping as established under the old laws of England had little or nothing to do with the desire to obtain money or reward for the release of the person kidnaped. The acts which constitute this crime were clearly stated in the former law of this state (Rem. Rev. Stat., § 2410), quoted in the majority opinion.

The crime stated in the first clause of the section last referred to is an heinous one, and one that may be perpetrated in connection with the exercise of the greatest cruelty, and is a crime deserving of condign punishment. If the court should construe the act of 1933 in accordance with the contention of appellants, the forcible sequestration within this state of a person over sixteen years of age, possibly for a long time, and under circumstances of great cruelty, would not constitute the crime of kidnaping, and it is possible that such a dastardly act might constitute no crime at all, or a misdemeanor merely.

The second clause of section 1 of the act of 1933, p. 9, establishes the crime of kidnaping in the second degree, and includes therein the unlawful taking by force or fraud of a person to or from a place without the state, and the bringing, keeping, or secreting of such person within the state, without the intent to extort or obtain money or reward for his release or disposition.

To me it is inconceivable that the legislature, while

making such acts as those last mentioned an offense for which a severe penalty shall be imposed, intended to depart from the ancient rule and permit one, with impunity, to kidnap and confine within this state a person residing therein.

While it is true that acts can be imagined which might constitute, under the statute, kidnaping in the first degree, which acts might not apparently deserve the severe penalty provided by the statute for conviction of that crime, that, in my opinion, is a legislative problem with which the courts are little concerned. In construing criminal statutes, it is the duty of the courts to so construe them, if possible, as not to allow acts which are manifestly most serious crimes against society to go unpunished.

Under the act of 1909, the seizing, confining, or inveigling of a person, with intent to cause him, without authority of law, to be in any way held to service, was made kidnaping, as was the same act, committed with intent to extort or obtain money or reward for the person's return, release or disposition. Each was a manner in which the crime might be committed. By the statute of 1933, these two different methods of committing the crime of kidnaping were combined, and while it may be argued that a better law than the 1933 act might be enacted, that fact alone does not make the statute bad or require that words and language which are unambiguous be construed otherwise than in accordance with their plain meaning.

I am convinced that it should not be held that the words "with intent to extort or obtain money or reward for his release or disposition," as contained in § 1 of the act now in force, are a part of the first portion of the section ending with the word "imprisoned." In my opinion, they are a part of the second phase of the crime, defined as holding to service.

I concur in the opinion of the majority holding that the record before us supports the conviction of appellants of the crime of kidnaping in the first degree, as defined by the statute now in force.

I cannot agree with the majority in holding that an emotional reaction or satisfaction may constitute a reward, within the meaning of the statute. The case of *State v. Andre,* 195 Wash. 221, 80 P. (2d) 553, referred to in the majority opinion, was correctly decided, as the defendant procured, by kidnaping the prosecuting witness, a direct financial reward, the absolute equivalent of money, namely, transportation in a taxicab from the place where the defendant was to the place to which he desired to go. In my opinion, the opportunity to inflict torture upon the prosecuting witness in the case at bar, and the satisfaction which appellants may have derived from the infliction of such torture, does not constitute a reward, within the meaning of the statute.

I am in accord with the majority opinion in holding that appellants Berry, McAloon, and Reddick were properly convicted of the crime of assault in the first degree, and appellant Smith of the crime of assault in the second degree.

With the exception noted, I concur in the majority opinion.

STEINERT, J. (dissenting in part)—I am unable to concur with the majority in holding that the information was sufficient to charge appellants with the crime of kidnaping in the first degree, within the meaning of Rem. Rev. Stat. (Sup.), § 2410-1. I am of the opinion that the phrase "with the intent to extort or obtain money or reward for his release or disposition" modifies all the preceding language of the section and not, as the majority holds, merely the clause "or in any way held to service"; further, I believe that, when the legis-

lature adopted the kidnaping act of 1933, it did so with the avowed purpose of making an entire revision of the former law upon the subject by classifying the crime of kidnaping into degrees, dependent upon the presence or absence of intent to extort a ransom for the release of the victim, and fixing different penalties therefor.

A comparison between the former law and the present law is of interest.

The act of 1909, Laws of 1909, chapter 249, p. 935, § 158, Rem. Rev. Stat., § 2410, reads as follows:

"Every person who shall willfully—

"(1) Seize, confine or inveigle another with intent to cause him without authority of law to be secretly confined or imprisoned, or in any way held to service, or with intent to extort or obtain money or reward for his return, release, or disposition, or to lead, take, entice away, or detain, a child under the age of sixteen years with intent to conceal him from his parent, guardian or other person having lawful care or control of him, or to steal any article upon his person; or

"(2) Abduct, entice, or by force or fraud unlawfully take or carry away another to or from a place without the state, and shall afterwards send, bring or keep such person, or cause him to be kept or secreted within this state;

"Shall be guilty of kidnaping, and punished by imprisonment in the state penitentiary for not less than ten years."

The act of 1933, Laws of 1933, Ex. Ses., chapter 6, p. 8 (Rem. Rev. Stat. (Sup.), § 2410-1), is entitled:

"An Act relating to the crime of kidnaping and the punishment therefor, *and repealing section 158, chapter 249, Session Laws, 1909 (section 2410, Remington's Revised Statutes of Washington),* and declaring that this act shall take effect immediately." (Italics mine.)

Section 1 of the act, p. 8, provides:

"Every person who shall wilfully,

"(1) Seize, confine or inveigle another with intent to cause him without authority of law to be secretly confined or imprisoned, or in any way held to service *with the intent to extort or obtain money or reward for his release or disposition,* shall be guilty of *kidnaping in the first degree,* and upon conviction thereof shall be punished by death or by imprisonment in the state penitentiary for life as the jury shall determine; and in every trial for kidnaping in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted; and if such special verdict is in the affirmative, the penalty shall be death, otherwise, it shall be as herein provided. All executions in accordance herewith shall take place at the state penitentiary under the direction of and pursuant to arrangements made by the superintendent thereof: *Provided,* the time when such execution shall take place shall be set by the trial judge at the time of imposing sentence and as a part thereof.

"(2) Lead, take, entice away or detain a child under the age of sixteen years with intent to conceal him from his parent, parents, guardian or other lawful person having care, custody or control over him, or with intent to steal any article from his person, *but without the intent to extort or obtain money or reward for his return,* or shall abduct, entice, or by force or fraud unlawfully take or carry away another to or from a place without the state, and shall afterwards send, bring or keep such person, or cause him to be kept or secreted within the state *without the intent to extort or obtain money or reward for his release or disposition,* shall be guilty of *kidnaping in the second degree* and shall be punished as in the case of a felony . . ." (Italics mine.)

The act of 1909 defined four types of unlawful conduct as constituting kidnaping, only one of which contemplated extortion as an essential element. All four, however, were of equal gravity in the eyes of the law,

and the penalty for each was the same, imprisonment in the penitentiary for a term of not less than ten years.

The sensational abduction of the Lindbergh baby on March 1, 1932, and the wave of similar crimes following in its wake, the motives of which were the extortion of ransom, prompted the Federal government and many of the states to revise their criminal statutes in an effort to prevent the recurrence of atrocities involving the lives and health of innocent persons.

It seems plain to me that the intention of the legislature, in enacting the 1933 law, was to divide the crime of kidnaping into two degrees: (1) where the offense was committed with intent to extort a ransom, for which the penalty was life imprisonment or death, and (2) where the offense was committed without such intent, in which event the penalty was that ordinarily fixed for a felony. The reasons for such classification are, of course, obvious. The legislature recognized that ransom was the usual motive, without which the crime would seldom be committed; and, further, that, in such instances, if the ransom was not forthcoming, the victim in the hands of the criminal would likely be killed or suffered to die from want of care, as experience had amply shown.

Such an interpretation appears to follow both from the manner in which the statute was enacted and from its content. If our present law is to be given the interpretation placed upon it by the majority opinion herein, then it was wholly unnecessary for our legislature to do more than to increase the penalty for violation of the 1909 law from a minimum term of ten years, to life imprisonment or death. The former law covered every other angle and phase of the present law.

The legislature, however, did not *amend* the 1909 law, as the majority intimates; it expressly *repealed*

it, so that none of its provisions thereafter remained in force. Having abrogated the old law, the legislature enacted an entirely new one.

An analysis of the language and arrangement of the 1933 act confirms me in the view that I have taken. The interpretation of the majority renders the present law illogical and unreasonable in several particulars.

According to the majority view, it is a crime to seize, confine, or inveigle another *with intent to cause him to be secretly confined or imprisoned,* but it is not a crime to seize, confine, or inveigle another with intent to "hold him to service" *unless* there be an intent to extort or obtain money or reward for his release or disposition. Could the legislature possibly have meant that subjecting one to service, after he had been seized, confined, or inveigled, was a lesser offense than merely seizing, confining or inveigling him without such subjection to service? I do not think so, for, obviously, to hold one to service is to add to the flagrancy of the wrong.

According to the interpretation of the majority, it is kidnaping in the first degree, punishable by life imprisonment or death, if an *adult* or a person *over* sixteen years of age be seized, confined, or inveigled for the purpose of secret confinement or imprisonment, while if the same act be perpetrated upon a child *under* the age of sixteen years, it is only kidnaping in the second degree, punishable as a felony, *unless* it be done with intent to extort money for his return. Did the legislature contemplate that result? I do not think so, for the reason that the necessity of preventing abduction is greater, if anything, in the case of helpless children than in the case of adults; moreover, the law was enacted to arrest a crime wave which had involved principally the kidnaping of infants.

According to the interpretation of the majority, if a

person be seized, confined, or inveigled, and held in confinement or imprisonment *within* this state, it is kidnaping in the first degree; but if the person be taken *beyond* the jurisdiction of this state, and subsequently returned and kept or secreted *within* the state, it is only kidnaping in the second degree, *unless* it be done with intent to extort or obtain money for his release or disposition. Did the legislature mean that it was a less offense to transport the victim beyond the state line and then return him, than it was to retain him continuously within the state? I do not think so, for taking a person without the state makes the capture of the criminal more difficult and exposes the captive to greater hazards.

The interpretation of the majority is illogical for another reason. As the statute is now made to read, the crime of kidnaping in the second degree includes within it all the elements of kidnaping in the first degree. In other words, the graver crime is the lesser offense.

The effect of the prevailing opinion, in my judgment, exceeds all rational purposes of the act. Two illustrations will suffice, though many more could be suggested.

Suppose that a merchant discovers that a rock has been thrown through his store window. He sees a boy in the vicinity who, he *thinks*, is the miscreant. He takes the boy into custody and, without authority of law, confines him in the basement of his store, not for the purpose of compelling the boy to pay for the damage done, nor with the intent of obtaining money for the boy's release, but simply to satisfy his own resentment. As the statute is now construed by the majority, the merchant is guilty of kidnaping in the first degree, subject to life imprisonment or hanging.

Again, suppose that a man invites another to his office, or to his home, and during the course of some dispute, or through sheer malice, turns the key in the lock and refuses to let his visitor depart or to communicate with relatives or friends. No demand for ransom is made or intended, yet, according to the majority opinion, such person is guilty of kidnaping in the first degree and may be imprisoned for life or hung.

True, indeed, a prosecuting attorney may hesitate to file an information in either of the illustrative cases, but what about the victim who proffers the complaint? Is he to be told that, although he has been kidnaped within the meaning of the graver provision of the statute, the penalty is too great to be imposed under such circumstances or that it is the province of the prosecutor to determine whether a criminal shall stand trial for a crime the elements of which he is charged with committing?

I will concede that, under my interpretation of the statute, one might seize, confine, or inveigle another and cause him to be secretly confined without being guilty of the crime of kidnaping at all. But the answer to that is threefold. (1) If such should be the case, it is the fault of the statute; (2) aside from the cases mentioned in subd. 2 in the 1933 statute, there would rarely be a case of kidnaping without intent to extort money or reward; and (3) if there were such a case, it would, in practically every instance, be attended with an act of maiming (Rem. Rev. Stat., § 2407 [P. C. § 8992]), assault (Rem. Rev. Stat., §§ 2413 to 2415 [P. C. §§ 8758 to 8760]), or coercion (Rem. Rev. Stat., § 2614 [P. C. § 8827]), and punishable under the statutes just cited. In the case at bar, appellants would not be immune to punishment, for their acts involved (1) conspiracy (Rem. Rev. Stat., § 2382 [P. C. § 8783]), (2) unlawful assembly (Rem. Rev. Stat., § 2550 [P. C.

§ 9080]), (3) burglary (Rem. Rev. Stat., § 2578 [P. C. § 8771]), (4) personation of an officer (Rem. Rev. Stat., § 2616 [P. C. § 8868]), (5) false arrest (Rem. Rev. Stat., § 2611 [P. C. § 8824]), (6) coercion (Rem. Rev. Stat., § 2614), (7) assault (Rem. Rev. Stat., §§ 2413 to 2415), and (8) maiming (Rem. Rev. Stat., § 2407).

To say the least, the statute in its present form is ambiguous as to whether or not intent to extort money or reward is a necessary element of the crime of kidnaping in the first degree. If there be an ambiguity, then, under every rule of criminal procedure, that interpretation must be adopted which is the more favorable to the accused.

There is yet another phase of the majority opinion with which I do not agree. The opinion holds that the desire for revenge or the satisfaction of any emotional upheaval constitutes a reward within the meaning of the statute. If that be the legal definition of "reward" as applied to the statute, then any emotion capable of satisfaction, or sought to be satisfied, is sufficient. It may be vengeance, hatred, anger, malevolence, dislike, contempt, disapprobation, even curiosity as to how the victim will react under the circumstances, or it may be the prompting of mere mischief. In short, it is anything from which the perpetrator may gain any kind of momentary emotional satisfaction.

However, what the majority seems to have overlooked is the very statute on which it relies, for by the terms of the act the "reward" must be for the "release or disposition" of the victim, not for some abstract, vagrant, or even malicious emotion experienced or indulged by the malefactor. In my opinion, this is a strained construction which even the civil law would not countenance, much less the criminal law of this state.

I think that the judgment should be reversed on count one of the information and affirmed on count two.

GERAGHTY, MAIN, and ROBINSON, JJ., concur with STEINERT, J.